**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

ROBERT JOHNSTON,

Plaintiff,

v.

SOO LINE RAILROAD COMPANY, *d/b/a CPKC*,

Defendant.

Civil No. 24-4394 (JRT/SGE)

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Kathryn Averwater and Nicholas D. Thompson, **CASEY JONES LAW**, 729 North Washington Avenue, Suite 600, Minneapolis, MN 55401, for Plaintiff.

Sharon S. Beck, **STINSON LLP**, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402; and

Sara Welch, **STINSON LLP**, 1201 Walnut Street, Suite 2500, Kansas City, MO 64106, for Defendant.

Plaintiff Robert Johnston injured his knee while working on behalf of Defendant Soo Line Railroad Company ("Soo Line"). Johnston alleges that Soo Line then pressured him to return to the hospital and change the treatment plan for his injury to allow him to return to work more quickly. Johnston argues that these allegations support a claim for interference with medical treatment under the Federal Railroad Safety Act ("FRSA"). Johnston further alleges that he faced retaliation in the form of more frequent workplace assessments, ultimately leading to his resignation.

On January 23, 2026, Soo Line moved for summary judgment on all of Johnston's claims. Because genuine disputes of material fact remain as to whether Soo Line interfered with Johnston's medical treatment and as to whether the heightened scrutiny on Johnston after his injury constituted retaliation, the Court will deny Soo Line's summary judgment motion.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. Plaintiff's injury

In 2021, Johnston began working for Soo Line, a large railroad carrier. (Decl. of Sarah Welch ("Welch Decl.") ¶ 9, Ex. F ("Johnston Dep.") at 54:14–16, 56:7–22, Jan. 13, 2026, Docket No. 51.) In the summer of 2023, Johnston was working as a steel erector, and he and his team were responsible for building, maintaining, and repairing Soo Line's railroad bridges. (*Id*. at 56:9–22, 57:12–58:20.)

On July 31, 2023, Johnston and his team were repairing railroad ties on the Whitewater Bridge between Winona and Wabasha, Minnesota. (*Id*. at 97:19–98:18.) Johnston's right foot slipped between the ties, and he fell down to his groin. (*Id.* at 99:12–100:21.) Johnston's knee smashed into the bridge, causing immediate pain and swelling. (*Id*. at 101:8–11, 109:12–22.) Johnston's coworker Eric Currier notified Johnston's supervisor, Jonathan Claycamp, of the incident. (*Id.* at 114:6–22.)

Jim Stoeckly, another coworker, drove Johnston to an emergency room in Wabasha. (*Id*. at 109: 23–24, 115:6–13.) At the ER, Dr. Paul Nystrom examined Johnston,

took an x ray, and diagnosed him with bruising of the soft tissue around his knee. (*Id*. at 117:18–118:25; Decl. of Kathryn E. Averwater ("Averwater Decl.") ¶ 11, Ex. 9 ("After Visit Summary").) Dr. Nystrom's written instructions after the visit stated that Johnston should return to work "on August 2 [after a day off] if he is feeling better" and said he could take "up to 4000 mg of acetaminophen and 2400mg of ibuprofen per day if needed." (After Visit Summary.) Johnston testified that Dr. Nystrom asked him if he wanted time to recover, to which Johnston said yes, wanting the option to miss work if his knee got worse. (Johnston Dep. 121:3–25, 125:14–25.)

**B. Soo Line allegedly interferes with Plaintiff's medical care**

Johnston alleges that one of his superiors, Nate Lund, "cajoled [him] to tell [Dr. Nystrom] not to prescribe him pain medication" while he was at the ER. (Am. Compl. ¶ 10, June 9, 2025, Docket No. 30; *see also* Johnston Dep. at 59:22–60:1.) Johnston later testified that on the same call, Lund inquired whether Johnston wanted Lund to purchase over-the-counter pain medications for him. (Johnston Dep. 138:5–139:9.)

Johnston further alleges that, upon returning to Winona for a post–injury "drill down" meeting,[1] Claycamp and Lund attempted to convince Johnston to return to the emergency room to change the treatment plan on his discharge paperwork. (*Id.* at 169:19–172:13.) Johnston attests that: Lund indicated Johnston may lose his job if he did

[1] A "drill down" is a post–injury investigation to evaluate how an injury occurred and what efforts can be made to mitigate a similar injury in the future. (Welch Decl. ¶ 14, Ex. K (Dep. of Jon Claycamp) at 25:18–26:2.)

not have his discharge paperwork amended; Lund insisted that Johnston did not actually need so much medication; and Lund and Claycamp took turns seeking to convince Johnston to change the paperwork. (*Id.* at 171:13–172:23, 173:20–174:12, 179:9–21.) Johnston allegedly refused Lund's suggestion up to five times. (*Id.* at 171:1–9.) Johnston alleges that Lund was concerned about the difference between "reportable and not reportable" injuries and was worried that Johnston's would be "reportable." (*Id.* at 174:17–175:19.) Lund, on the other hand, testifies that Johnston was the one who wanted to return to work the next day, and that Lund and the other supervisors merely advised Johnston that if he wanted to work the next day, his discharge papers needed to reflect that. (Welch Decl. ¶ 10, Ex. G (Lund Dep.) at 21:2–22:15.)

Ultimately, Johnston agreed to return to the emergency room, and Lund drove him there. (Johnston Dep. 176:17–177:7.) Lund informed the front desk that they needed to see Dr. Nystrom. (Johnston Dep. 186:7–18.) The parties disagree on whether Lund or Johnston asked Dr. Nystrom to change the discharge paperwork. (Johnston Dep. 186:19–24; Averwater Decl. ¶13, Ex. 11 (Nystrom Dep.) at 30:1–31:21; Lund Dep. 24:14–25:21.) But ultimately Dr. Nystrom altered the summary to state that Johnston may return to work on August 1, and he crossed out the instructions regarding medications. (Nystrom Dep. 31:2–21; Averwater Decl., ¶ 14, Ex. 12 (Revised After Visit Summary)). Images of the Revised After Visit Summary are reproduced, below:

AFTER VISIT SUMMARY

Robert Johnston MRN: 000023128879

Instructions

~~You can take up to 4000 mg of acetaminophen 2400 mg of ibuprofen per day if needed.~~ PA

Rest, ice, elevation

Your x-ray did not show any fracture. You certainly have some bruising of the soft tissue around your knee. I do not think you have any significant ligament injury.

Questions?

**Call your primary care provider's office weekdays if:**

- Symptoms, including pain, do not improve or they get worse.
- You have new symptoms.
- You have trouble getting your prescription.
- You have other questions or problems.

July 31, 2023

GUNDERSEN ST. ELIZABETH'S HOSPITAL AND CLINICS

**Patient:** Robert Johnston
**Date of Birth:** 11/29/1980
**Date of Visit:** 7/31/2023

**Department Information:** SEW HOSPITAL WABASHA - EMERGENCY
1200 GRANT BLVD W
WABASHA MN 55981
651-565-4531

To Whom It May Concern:

Robert Johnston was seen and treated in our department on 7/31/2023.
He may return to work on ~~08/02/2023.~~ 8/1/23
~~Patient may return to work on August 2 if he is feeling better.~~

Nystrom, Paul, MD

### C. Soo Line allegedly retaliates against Johnston

In the eight days following the incident, Johnston and his team were asked to participate in six assessments or "efficiency tests."[2] (Averwater Decl. ¶ 18, Ex. 16 (Employee Safety Report).) In the year before the incident, Johnston and his team were required to complete only between one and four efficiency tests per month, for a total of 32 over twelve months. (*Id.*)

Johnston or his team were asked to complete two efficiency tests on August 3, one of August 7, two on August 9, and one on August 10. (*Id.*) Johnston failed one of the August 9 efficiency tests.[3] (Johnston Dep. 77:17–78:3.) The failure was recorded in

[2] An "efficiency test" is an FRSA-mandated procedure to ensure employees are aware of and in compliance with safety measures. (Johnston Dep. 70:16–18, 71:14–21.)

[3] The report indicates that Johnston failed the test because he "walk[ed] on unsecured boards used as a walkway for access to the steps to climb up inside the truck at Milepost 327.05 . . . ." (Johnston Dep. 78:21–25; *see also* Employee Safety Report.)

Johnston's employee record as well as the corresponding record of his colleague Eric Currier's. (*Id.* at 87:6–21; Averwater Decl. ¶ 5, Ex. 3 (Dep. of Scott Paradise) at 19:4–12.) Soo Line did not formally discipline Johnston for failing the test. (Johnston Dep. 92:5–10.)

Johnston was concerned that he had been given a failing grade because of the situation related to his injury. He texted Claycamp:

> The failure I received today has been present since the beginning of the project and same circumstances present in prior jobs. It should have been remedied when it appeared. I feel it was only an issue after I reported an injury. You say that it is not retaliation but that's hard to grasp. I always want to better myself and stay safe but so many mixed messages is confusing. Any input appreciated.

(Averwater Decl. ¶ 19, Ex. 17.) Claycamp told him that the test was conducted solely out of concerns for safety. (Averwater Decl. ¶ 8, Ex. 6 ("Claycamp Dep.") at 52:19–53:14.)

On August 21, 2023, Johnston resigned from his position at Soo Line. (Averwater Decl. ¶ 20, Ex. 18.) In his resignation email, Johnston cited management persuading him to forgo treatment and the perceived retaliation as the reason for his decision. (*Id*.)

## II. PROCEDURAL BACKGROUND

Johnston filed a complaint with the Occupational Health and Safety Administration ("OSHA") on August 22, 2023. (Decl. of Michelle Haynes ("Haynes Decl.") ¶ 3, Ex. A, Jan. 21, 2025, Docket No. 17.) OSHA dismissed Johnston's complaint after finding that his employer did not significantly interfere with his medical treatment or retaliate against him. (*Id*. ¶ 5, Ex. C.)

Johnston appealed the OSHA decision to an Administrative Law Judge. (*See* Decl. of Sharon S. Beck ¶ 3, Ex. A, Jan. 21, 2025, Docket No. 18; Def.'s Mem. Supp. Mot. Dismiss at 4, Jan. 21, 2025, Docket No. 14.) While that action was pending, Johnston filed this action in federal court against Canadian Pacific Kansas City Limited ("CPKC") for violations of the FRSA. (*See generally* Compl. Dec. 5, 2024, Docket No. 1)

CPKC moved to dismiss the case under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and under Fed. R. Civ. P. 12(b)(5) for insufficient process. (Mot. Dismiss, January 12, 2025, Docket No. 12.) CPKC argued that Soo Line was Johnston's actual employer, that the Court lacked personal jurisdiction over CPKC, and that Johnston had not properly served CPKC. *See Johnston v. Can. Pac. Kan. City, Ltd.*, Civ. No. 24-4394, 2025 WL 1592376 (D. Minn. June 5, 2025). The Court denied CPKC's motion but set a deadline of 90 days for Johnston to "either properly serve CPKC or amend his Complaint to name Soo Line as the defendant in this action." *Id.* at *5. Johnston timely filed an Amended Complaint naming Soo Line as the Defendant. (*See generally* Am. Compl.)

Johnston brings two claims against Soo Line: (1) interference with Johnston's medical treatment in violation of 49 U.S.C. § 20109(c)(1); and (2) retaliation against Johnston after he suffered an injury, in violation of 49 U.S.C. § 20109(a)(1). (*Id.* ¶¶ 24–27.) Soo Line now moves for Summary Judgment on both Johnston's claims. (Mot. Sum. J., January 23, 2026, Docket No. 47.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### II. SOO LINE'S MOTION FOR SUMMARY JUDGMENT

Soo Line moves for summary judgment on Johnston's claims that Soo Line violated the Federal Railroad Safety Act ("FRSA") by (1) interfering with Johnston's medical treatment in violation of 49 U.S.C. § 20109(c)(1); and (2) retaliating against Johnston after

he suffered an injury, in violation of 49 U.S.C. § 20109(a)(1). The Court will address each claim in turn.

**A. Interference with Medical Care**

Under the FRSA, an employer may not "deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment." 49 U.S.C. § 20109(c). Soo Line argues that it has shown, as a matter of law, that it did not interfere with Johnston's medical care.

Johnston's medical interference claim centers on the allegation that he was pressured to return to the emergency room to change his discharge instructions. More specifically, Johnston attests that his supervisor drove him back to the emergency room, asked to see Johnston's doctor, and asked the doctor to alter his discharge instructions relating to his recommended medication and when he could return to work. (Johnston Dep. 186:8–24.) At this stage, it is Soo Line's burden to show that their handling of Johnston's injury was not, as a matter of law, "den[ial], delay, or interfere[nce] with" his medical treatment. Soo Line has not done so.

First, Soo Line argues that Lund's presence at Johnston's hospital visit, standing alone, does not violate the FRSA. For that proposition, Soo Line relies on *Blackorby v. BNSF Railway Company*, Civ. No. 13-908, 2015 WL 58601, at *4 (W.D. Mo. Jan. 5, 2015), in which the court held that there was no claim for medical interference where "the management employee show[ed] up at [the injured employee's] follow-up doctor's appointment" which the employee contended was "intimidation." As an initial matter,

*Blackorby* is not binding on this Court. Moreover, the evidence in this case gives rise to an entirely different claim. Lund was not merely present at a hospital visit—he allegedly pressured Johnston to return to the hospital, drove him there, asked to see the doctor, and asked him to alter the treatment instructions he had previously issued. *Blackorby* is not meaningfully analogous to this case.

Soo Line also contends that Johnston was allowed to pursue the course of treatment he desired, and that that Johnston did not, in fact, want or need prescription pain medication. Soo Line relies on *Roberts v. Union Pacific Railroad Company*, Civ. No. 17-315, 2019 WL 1227929, at *7 (D. Neb. Mar. 15, 2019), in which the court rejected a medical interference claim where, among three options, the plaintiff "chose [the] option" of "transportation to a hospital," and his supervisor "took Roberts to a hospital where he had his neck examined without interference." But again, that case—even if it were binding, which it is not—lacked any facts similar to Johnston's allegation that Lund asked Johnston's doctor to alter his treatment instructions.

The record lends some support to the contentions that Johnston did not want pain medication, wanted to return to work the next day, and consented to be returned to the hospital. But there remain genuine disputes of fact that must be resolved to determine whether Lund's actions rose to the level of interfering with Johnston's medical treatment. Therefore, the Court will deny Soo Line's motion for summary judgment on Johnston's medical interference claim.

**B. Retaliation**

Soo Line also moves for summary judgment on Johnston's claim of retaliation. The FRSA prohibits a railroad carrier from "disciplin[ing], or threaten[ing] discipline to, an employee for . . . following orders or a treatment plan of a treating physician . . . ." 49 U.S.C. § 20109(c)(2). Actions under this section are "governed under the rules and procedures set forth in section 42121(b)." *Id.* § 20109(d)(2)(A). To prevail, Johnston must first establish a prima facie case of retaliation by showing that "(i) he engaged in a protected activity; (ii) [Soo Line] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)). If Johnston establishes this prima facie case, Soo Line must prove, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of [Johnston's] protected activity." *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)) (internal brackets omitted)).

Soo Line concedes for the purposes of its motion that Johnston has established that he engaged in protected activity and that Soo Line knew Johnston did so. Soo Line disputes, however, whether Johnston suffered an adverse action and whether Johnston's protected activity was a contributing factor in the adverse action. Soo Line also argues that it cannot be found liable because it would have taken the same actions—that is, requiring Johnston to undergo efficiency testing—regardless of his injury report.

The Court will first address whether Johnston has established a prima facie case and then whether Soo Line has established its affirmative defense.

### 1. Adverse Action

Johnston's allegation that he suffered an adverse action centers on Soo Line's implementation of a string of safety exercises or "efficiency tests" that Johnston was asked to complete in the nine days after his injury. In one of these tests, Johnston received a "fail" that was noted in his employee record and which resulted in coaching. (Employee Safety Report; see also Claycamp Dep. 32:13-23.) Johnston argues that the number of tests exacted unusual scrutiny and pressure and constituted an adverse employment action for the purposes of the FRSA. Soo Line contends that, as a matter of law, the tests were not an adverse action.

When determining what constitutes an adverse employment action for the purposes of an FRSA retaliation claim, many courts apply the Supreme Court's definition from the Title VII context.[4] For example, the Second Circuit has relied on Title VII case law in interpreting the retaliation provision of the FRSA. *See Ziparo v. CSX Transp. Inc.*, 160 F.4th 315, 340 (2d. Cir. 2025) ("We think that the reasoning in *Burlington Northern* and *Carr* compel us to conclude that the broader definition of a retaliatory hostile work environment applies in the FRSA context.").

[4] The Eighth Circuit has not defined what constitutes an "adverse employment action" in the FRSA context.

In *Burlington Northern & Sante Fe Railway Co. v. White*, the Supreme Court held that an employment action is adverse when it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In the Title VII context, the Eighth Circuit has held that an adverse action "must be material, not trivial" and "must produce some injury or harm." *AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (internal quotation marks omitted).

The Court will adopt the reasoning of the Second Circuit and "conclude[s] that a retaliatory hostile work environment is a cognizable adverse employment action under the FRSA." *Ziparo*, 160 F.4th at 339. Accordingly, the Court's inquiry at this stage is whether "a reasonable juror could find that [Soo Line] subjected [Johnston] to actions that might well have dissuaded a reasonable employee from [reporting his injury]." *Id.*

The Court concludes that Johnston has established an adverse employment action sufficient to survive summary judgment. Johnston has attested that after returning to work, he felt that he had a "target on [his] back," and felt that if he did "one little thing wrong, [he'd be] gone." (Johnston Dep. 275:2–12.) Johnston stated this feeling was a result of "supervisors surrounding the work site for the next week," including compelling him and his team to complete six "efficiency tests" during that period, one of which he failed. (*Id.* 275:25–276:2, 276:13–21.) Moreover, that failure was logged in his employee file, and Johnston was required to receive coaching and counseling. (Employee Safety

Report; see also Claycamp Dep. 32:13-23.) A reasonable juror could find that Soo Line subjected Johnston to actions that might well have dissuaded a reasonable employee from reporting his injury.

It seems that a reasonable jury could alternatively conclude that the efficiency tests, entry of a failed test into Johnston's employee file, and coaching and counseling were a result of unsafe work practices and were not a retaliatory measure. But the Court's inquiry on this prong is centered on whether the employer's conduct **could have** dissuaded an employee from reporting workplace injuries in the future. Because a reasonable juror could find that Soo Line's workplace testing following Johnston's injury was a retaliatory tactic to dissuade reporting future injuries, there is a factual dispute regarding whether Johnston suffered an adverse action, and summary judgment is not warranted.

**2. "Contributing Factor"**

To prevail on a retaliation claim, Johnston must also show that his protected activity (that is, reporting his injury) was a contributing factor in Soo Line's adverse action (that is, Soo Line's decision to subject him to multiple efficiency tests in the days after his injury). A contributing factor "includes any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the [adverse] decision." *Carter v. Sec'y, Dep't of Lab.*, 108 F.4th 1028, 1033 (8th Cir. 2024). "[T]he contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Id.* (cleaned up). "Temporal proximity between the protected activity

and the adverse decision can serve as evidence of retaliation . . . ." *Id.* But "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kuduk*, 768 F.3d at 792.

Soo Line argues that Johnston has not presented evidence, beyond temporal proximity, that his injury report was a contributing factor to the increased frequency of efficiency tests. Soo Line highlights that Johnston's "co-worker, E.C., engaged in the same unsafe behavior as [Johnston], on the same day, and also received the same efficiency test failure on August 9." (Def.'s Mem. at 32.) Soo Line argues, therefore, that the efficiency tests were not targeted at Johnston.

Nevertheless, "two causes being non-mutually exclusive is the very essence and definition of a 'contributing' factor." *Blackorby v. BNSF Rwy. Co.*, 936 F.3d 733, 737 (8th Cir. 2019). Soo Line's identification of a potential alternative rationale for the efficiency tests is not sufficient to rule out retaliation, particularly in the context of Lund and Claycamp's evident concern with the circumstances surrounding Johnston's injury and treatment—to the point of returning him to the hospital to change his discharge instructions. Moreover, Johnston testifies that the way his supervisors treated him in the workplace changed after his injury. (*E.g.*, Johnston Dep. 276:9–25.) In light of this evidence, and absent a more compelling rationale for the uptick in scrutiny on Johnston, a jury could conclude that the protected workplace activity was a contributing factor to

the subsequent efficiency tests and to Johnston's failing one of those tests. Accordingly, Johnston has met his burden to defeat summary judgment on the fourth element of a prima facie case of retaliation.

**3. Affirmative Defense**

Soo Line argues that summary judgment is nevertheless warranted at this stage because it can "demonstrate[], by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [the protected conduct.]" 49 U.S.C. § 42121(b)(2)(B)(ii).

The Court concludes that Soo Line has not carried its burden to establish this affirmative defense. Soo Line performed four efficiency tests in the month prior to the injury report and did not give Johnston a failing grade, even though Johnston alleges that the flaw in his team's procedures that led to the later failure had been present throughout all these tests. (*See* Claycamp Dep., 53:15–54:18.) Given this evidence, the Court concludes that Soo Line has not demonstrated by clear and convincing evidence that it would have taken the same actions in the absence of Johnston reporting his injury. Specifically, it is not clear that Soo Line would have required the same frequency of efficiency tests or would have given Johnston his failing grade, absent Johnston's injury report.

* * *

Because genuine disputes of material fact remain regarding elements of Johnston's retaliation claim and because Soo Line has not demonstrated by clear and convincing

evidence that it would have taken the same actions even if Johnston had not reported his injury, the Court will deny Soo Line's motion for summary judgment with respect to Johnston's retaliation claim.

**CONCLUSION**

After careful review of the record evidence, the Court will deny Soo Line's summary judgment motion. Genuine disputes of material fact remain regarding whether Johnston's supervisors' conduct following Johnston's injury constituted interference with medical treatment under the FRSA. Moreover, factual disputes remain as to whether Johnston's injury report contributed to the sharp increase in efficiency tests on Johnston and his team and to Soo Line assigning him a failing grade on one of those tests. The temporal proximity between the events and Johnston's supervisors' clear concern regarding the circumstances of Johnston's injury and his treatment are sufficient to defeat summary judgment.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Soo Line Railroad Company's Motion for Summary Judgment (Docket No. [47]) is **DENIED**.

DATED: August 21, 2026
at Minneapolis, Minnesota.

/s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge